[No. 4067.  Decided March 15, 1902.]

E. J. HATHAWAY et al., Respondents, v. E. A. McDONALD
et al., Appellants.

APPEAL — DISMISSAL — FAILURE TO EXCEPT TO FINDINGS.

The fact that a judgment was rendered upon findings of fact
and conclusions of law, and that appellant took no exceptions
thereto, would not be ground for dismissal of the appeal, where
the errors assigned arose upon the pleadings.

PURE FOOD LAW — STATUTES — PENALTY INCLUDED WITHIN TITLE.

An act entitled "an act regulating the manufacture of dairy
products, to prevent deception or fraud in the sale of the same
or imitation thereof, providing for the appointment of a dairy
commissioner and defining his duties, . . . providing pen-
alties for violations of this law," etc., is broad enough to cover
provisions for the confiscation of fraudulent dairy products.

SAME — PROCESS BUTTER — RIGHT TO CONFISCATE.

Under Laws 1899, p. 56, which provides in § 28 that the dairy
commissioner may seize and take possession of any article, the
sale of which is prohibited by that act, and in § 30 that no per-
son shall manufacture or offer for sale process butter, unless
the same is plainly marked "Renovated Butter," under penalty
of fine or imprisonment, or both fine and imprisonment, the dairy
commissioner is authorized to seize such process butter when
kept for sale in violation of law, since by a construction of the
two sections together the commissioner is fully clothed with
such power, although the penalty by fine and imprisonment is
imposed.

SAME — VIOLATION OF INTERSTATE COMMERCE — POLICE POWER OF
STATE.

A state statute prohibiting the sale of process butter unless it
is plainly marked with the words "Renovated Butter," so as to
prevent the imposition of a fraud upon the public, falls within
the police powers of the state, and is not in violation of art. 1,
§ 8 of the federal constitution, which delegates to congress the
power to regulate commerce between the states, even when such
butter is sent into this state from another state for purposes
of sale in unbroken packages.

Appeal from Superior Court, Spokane County.—Hon.. Leander H. Prather, Judge. Reversed.

*Horace Kimball,* Prosecuting Attorney, and *Miles Poindexter,* for appellants.

*W. J. Thayer,* for respondents.

The opinion of the court was delivered by

Dunbar, J.—Respondents sued in replevin to recover a quantity of process or renovated butter which had been seized by the appellant E. A. McDonald in his capacity as state dairy commissioner. Appellants demurred to the complaint, which demurrer was overruled. Appellants then answered, respondents demurred to the answer, which demurrer was sustained, and thereupon, after the taking of evidence, and a trial by the court, a jury being waived, final judgment was rendered against the appellants for said process butter, for $181.75, with interest, as damages, and for costs and disbursements. Appellants have appealed from said final judgment, and assign as error the order overruling the demurrer to the complaint, and also the order sustaining the demurrer to the answer.

The respondents move to dismiss the appellants' appeal herein on the ground that judgment was rendered in favor of respondents upon findings of fact and conclusions of law made by the court, and that no exceptions were ever. taken by the appellants, or any of them, to said findings and conclusions. But the errors assigned by appellants arise upon the pleadings, and, it is alleged, consist in overruling the demurrer to the complaint, and in sustaining the demurrer to the answer. The appellants have a right to assign any error which they see fit, for the consideration of this court; and if they desire to waive any exceptions to the findings of fact, and to bring their case here

upon errors arising upon the pleadings, they certainly have a right to do so. The motion will be overruled.

Chapter 43 of the Laws of Washington of 1899 (p. 56), in an act entitled "An act regulating the manufacture of dairy products, to prevent deception or fraud in the sale of the same or imitation thereof, providing for the appointment of a dairy commissioner and defining his duties," etc., among other things, provides, in § 28, as follows:

"Possession by any person or firm of an article or substance the sale of which is prohibited by this act shall be considered *prima facie* evidence that the same is kept by such person or firm in violation of the provisions of this act, and the commissioner shall be authorized to seize upon and take possession of such articles or substances, and upon the order of any court which has jurisdiction thereof, he shall sell the same for any purpose other than to be used for food, the proceeds to be paid to the state treasurer and placed to the credit of the general fund."

Section 30 is as follows:

"No person, firm or corporation shall manufacture, sell or offer for sale or have in his possession with intent to sell butter known as process butter, unless the package in which the butter is sold has marked on the side of it the words 'Renovated Butter' in capital letters one inch high and one-half inch wide with ink which is not easily removed: Provided, that it shall be unlawful for any retailer to sell said butter and unless a card is displayed on the package from which he is selling butter with the following words printed thereon so that it may be easily read by the purchaser 'Renovated Butter,' or if it is sold in packages on which a wrapper is used the words 'Renovated Butter' shall be plainly printed on each and every wrapper: Provided further, that all process butter shipped from other states shall be subject to the same regulations as provided in this section. . Whoever violates the pro-

visions of this section shall be deemed guilty of a misde-
meanor, and upon conviction shall be fined for each and
every offense not less than twenty-five dollars ($25) nor
more than one hundred dollars ($100) or by imprisonment
for not less than one month or more than six months, or
by both such fine and imprisonment."

The complaint alleges, among other things, that the
plaintiffs were copartners doing business under the firm
name of Hathaway & Co., were residents of the state of
Iowa, and were engaged in said state in the manufacture
of butter, and the selling and shipping thereof into various
states of the Union from said state of Iowa; that on the
1st day of October, 1900, they were the owners and in
possession of about 300 pounds of butter at their place of
business in the state of Iowa, which said butter was ship-
ped in original packages to the city of Spokane, Wash-
ington, consigned to one Brown, a resident of the city of
Spokane; that said McDonald is dairy commissioner of the
state of Washington, and the said dairy commissioner, as-
suming to act under the provisions of chapter 43 of the
Session Laws of the state of Washington for the year 1899,
took possession of all said butter, without notice to, or the
knowledge and consent of, said plaintiffs, and delivered
said butter to said defendant Edgar H. Stanton to keep
and hold the same for said dairy commissioner, and that
said Stanton now holds said butter, and that plaintiffs de-
manded possession of same from each of the defend-
ants, and they have failed and refused the possession
thereof to plaintiffs; that on October 15th said dairy
commissioner instituted an alleged proceeding in said
court, and obtained from one of the judges thereof
a pretended order authorizing the sale of said butter
by said dairy commissioner on November 9, 1900;
that said order was made without due process of

law, without notice to plaintiffs without giving them
an opportunity to be heard, and in violation of the
rights granted them by the constitution of the United
States; that all of said butter is now in the original pack-
ages, and is pure, unadulterated butter, and was shipped
to Spokane by plaintiffs by virtue of their rights under
the interstate commerce law of the United States of Amer-
ica; alleging that said chapter 43, as applied to butter, and
to plaintiffs' right to ship same, was unconstitutional and
void; alleging the value of the butter, and the damages
sustained; and praying judgment for the return of the
same, or for $1,000, the value thereof. · The answer al-
leged that the order of the court referred to in the com-
plaint was duly made on the 15th day of October, 1900,
and directed the sale of said butter by the said E. A. Mc-
Donald, as said dairy commissioner, on the 9th day of No-
vember, 1900, to the highest bidder, and directed the said
dairy commissioner to immediately deposit in the United
States post office in the city of Spokane a copy of the said
order, and the petition upon which the same was based,
duly certified, etc., directed to the said Hathaway & Co.,
at their post-office address in Sioux City, Iowa; that the
order was made upon a written petition of said E. A. Mc-
Donald, and that, in accordance with the directions of said
order, said McDonald on the 15th day of October, 1900,
notified said E. J. Hathaway & Co., by mail, in the man-
ner directed as aforesaid; alleges that the so-called butter
seized by said defendant was not pure, unadulterated but-
ter, but was what is and then was known as "process"
butter, also known as "renovated" butter, and consisted of
old, rancid, and putrid cow butter, which had been treated
by a certain process, with heat and chemicals, by which
the rancid taste and smell were removed therefrom, and

the same was artificially colored so as to exactly resemble pure and fresh creamery butter, so closely as to escape detection, except upon an expert chemical analysis of the same; that at the time of the seizure aforesaid the said Hathaway & Co. were offering the said process butter for sale, and intended to sell the same to one R. Brown, at wholesale, in the packages in which the same was then contained, and the same was then in the county of Spokane, state of Washington, and neither the said packages, nor any of them, had marked upon their side, nor at all, the words "Renovated Butter," in capital letters one inch high and one-half inch wide, with ink which is not easily removed, nor in any letters, nor at all; nor was there upon the said butter, nor any of it, at any place, nor upon any wrapper on or about the same, the words "Renovated Butter," marked or printed in any manner whatever; nor was there on or about the said packages, nor the said butter, nor any of the same, any card or cards with the words "Renovated Butter" printed or written thereon; alleges the wrongful detention of the butter; and asks for a judgment in defendant's favor. A demurrer was introduced to this answer on the ground that the affirmative allegations did not constitute any defense to the complaint. This demurrer was sustained. The court sustained the demurrer on the ground that the butter was pure and unadulterated, but that it was what is known as "process," and that the plaintiffs had a right to ship the same into the state of Washington under the interstate commerce law of the United States of America, and under the provisions of the constitution of the United States, and particularly under § 8 of article 1 thereof, because said butter was an article of commerce.

There are two propositions to be discussed in this case: (1) Does the statute quoted purport to authorize the

seizure of process butter? And (2) if it does so authorize the seizure, is the statute constitutional?

The first contention of the respondents is that the title to the act does not cover provisions for the confiscation of property. But we think an announcement that an act is an act regulating the manufacture of dairy products, to prevent deception or fraud in the sale of the same, or imitation thereof, or providing for the appointment of a dairy commissioner, and defining his duties, and providing penalties for violation of this law, is entirely sufficient to justify the provisions of §§ 28 and 30 (Laws 1899, p. 66). It is not feasible, nor is it required by any judicial construction, to set forth in the title of the act the nature and character of penalties provided for. It is also contended that there is nothing in the act which assumes to provide for the seizure of process butter, but that all that is intended is to fine the violator of the law, in relation to selling process butter without marking it as the law directs, in a sum of not less than $25 nor more than $100, or by imprisonment for not less than one month nor more than six months, or by both such fine and imprisonment. But the statute, to our minds, is so plain that it is difficult to base an argument in support of the fact that §§ 28 and 30, construed together, provide for the seizure of renovated butter, for § 28 provides that possession by any person or firm of an article, the sale of which is prohibited by this act, shall be considered *prima facie* evidence that the same is kept by such person or firm in violation of the provisions of this act, and that the commissioner shall be authorized to seize upon and take possession of such article, etc.; and § 30, which is a part of the act as much as 28, provides the prohibition of the sale of renovated butter, excepting under certain circumstances. But cer-

tain it is that renovated butter, such as is described in the answer, or renovated butter that has not the words "Renovated Butter" printed thereon, is prohibited by § 30. The only reasonable construction that can be placed upon the two sections is just what the section says,—that the possession of an article the sale of which is prohibited subjects the same to seizure.

The second position of the respondents is that, butter being a recognized article of commerce, no state has the right to interfere with, or even to regulate in any manner, the transportation or sale of it, until such time as the articles have been sold or delivered to a citizen of this state, and become a part of the mass of property of the state, and that, inasmuch as this butter was sent to this state in unbroken packages, it falls within the provisions of § 8, article 1, of the constitution, providing, in substance, that congress shall regulate commerce among the different states. This statute is not intended to, and does not, conflict with § 8 of article 1 of the constitution, which provides that congress shall have power, among other things to regulate commerce with foreign states and "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers"; but it falls within the powers reserved by the states, and not delegated to the United States by the constitution, viz., the police power, which is an inherent power in every state by reason of its sovereignty, and the power which it is universally conceded extends to the protection of the lives and health of the citizens, and to the preservation of good order and the public morals. The state cannot be divested, nor can it divest itself, of this power, because it is inalienable and necessary for the very existence of the state. There is no attempt 1 this law to interfere with the com-

merce between the states, nor to discriminate, as in many
of the cases cited by respondents, between the rights of
the citizens of different states to sell commodities of com-
merce by placing burdens upon one class which another
class was relieved of. Nor is there any attempt here to
prohibit the sale of process butter. The only attempt is
to prohibit the dealers in such butter, whether they be
residents of this or a sister state, from perpetrating a
fraud in the sale of such commodity; and such prohibi-
tion is not only the right, but the duty, of the state, to be
exercised under its conceded power to make laws for the
protection of the property and welfare of its citizens, and
for the promotion of good order and public morals. The
case most strongly relied upon by respondents in support
of their contention is *Leisy v. Hardin*, 135 U. S. 100 (10
Sup. Ct. 681). This was an action of replevin of sundry
kegs and cases of beer, begun in the inferior court of the
state of Iowa against a constable of Lee county, Iowa, who
had seized them under a search warrant issued by a jus-
tice of the peace pursuant to the statutes of Iowa, which
prohibit the sale or keeping for sale, or the manufacture
for sale, of any intoxicating liquor, including malt liquor,
for any purpose whatever, except for medicinal, pharma-
ceutical, chemical, or sacramental purposes; and it was
held by the supreme court of the United States that the
law, as applied to a sale by the importer, and in the orig-
inal packages or kegs, unbroken and unopened, of such
liquors manufactured in and brought from another state,
was unconstitutional and void, as repugnant to the clause
of the constitution granting to congress the power to reg-
ulate commerce with foreign nations and among the sev-
eral states. But it will be noted that in this case there is
no question of fraud, such as there is in the case at bar,

and in many of the cases cited by respondents this distinction is kept in view. The supreme court in the case just cited held that beer was a universally recognized article of commerce, and that, the congress of the United States having a right to regulate such articles, the state could not constitutionally pass a law which in any way infringed the right of congress; and it was urged that it was evidently the intention of congress that it should be the exclusive regulator of such commodities. A strong dissenting opinion was filed by three of the judges in this case, and, as showing the opinion of congress on the question of its own intention, it may be noted that since that time congress has amended the law in that respect so that, if the question should come up now under the statute of Iowa as it then existed, the ruling would of necessity be different. But the identical question here discussed was passed upon by the supreme court of the United States in a later case, viz., *Plumley v. Massachusetts,* 155 U. S. 461 (15 Sup. Ct. 154), where it was held that the statute of Massachusetts of March 10, 1891 (Stat. Mass. 1891, ch. 58, p. 165), to prevent deception in the manufacture and sale of imitation butter or oleomargarine, artificially colored so as to cause it to look like yellow butter, and brought into Massachusetts, is not in conflict with the clause of the constitution of the United States investing congress with power to regulate commerce among the several states; and the court, in passing upon that question, used the following language:

"It will be observed that the statute of Massachusetts which is alleged to be repugnant to the commerce clause of the constitution does not prohibit the manufacture or sale of all oleomargarine, but only such as is colored in imitation of yellow butter produced from pure unadulterated milk or cream of such milk. If free from colora-

tion or ingredient that 'causes it to look like butter,' the right to sell it 'in a separate and distinct form, and in such manner as will advise the consumer of its real character,' is neither restricted nor prohibited. It appears in this case that oleomargarine, in its natural condition, is of 'a light-yellowish color,' and that the article sold by the accused was artificially colored 'in imitation of yellow butter.' Now, the real object of coloring oleomargarine so as to make it look like genuine butter is that it may appear to be what it is not, and thus induce unwary purchasers, who do not closely scrutinize the label upon the package in which it is contained, to buy it as and for butter produced from unadulterated milk or cream from such milk. The suggestion that oleomargarine is artificially colored so as to render it more palatable and attractive can only mean that customers are deluded, by such coloration, into believing that they are getting genuine butter. If any one thinks that oleomargarine, not artificially colored so as to cause it to look like butter, is as palatable or as wholesome for purposes of food as pure butter, he is, as already observed, at liberty under the statute of Massachusetts to manufacture it in that state or to sell it there in such manner as to inform the customer of its real character. He is only forbidden to practice, in such matters, a fraud upon the general public. The statute seeks to suppress false pretenses and to promote fair dealing in the sale of an article of food. It compels the sale of oleomargarine for what it really is, by preventing its sale for what it is not. Can it be that the constitution of the United States secures to any one the privilege of manufacturing and selling an article of food in such manner as to induce the mass of people to believe that they are buying something which, in fact, is wholly different from that which is offered for sale? Does the freedom of commerce among the states demand a recognition of the right to practice a deception upon the public in the sale of any articles, even those that may have become the subject of trade in different parts of the country?"

The language used by the learned court in this case might appropriately be applied to the case at bar, for process butter, under out statute, is not prohibited, but the intention of the statute is to prohibit fraudulently selling process butter for fresh creamery butter. These laws are what is known in common parlance as "pure food laws." They are in the interest of health, cleanliness, and good morals, and universally upheld when not substantially infringing upon the powers of congress; and no case, we think, has gone so far as to hold that the police power of the state cannot be exercised for the prevention of fraud in matters of this kind without being subjected to the charge of impinging upon constitutional rights.

We are not certain that there was enough in the complaint to subject it to the demurrer interposed, but the answer stated a cause for defense under the statute, and the demurrer was wrongly sustained. The judgment will be reversed, with instructions to overrule the demurrer to the answer.

REAVIS, C. J., and WHITE, HADLEY, ANDERS and MOUNT, JJ., concur.