[No. 39941.  En Banc.  October 10, 1968.]

KENNETH REESMAN et al., Respondents, v. THE STATE OF WASHINGTON et al., Appellants.*

*Reported in 445 P.2d 1004.

*The Attorney General* and *E. E. Bill Rosatto, Assistant,* for appellants.

*J. Hugh Aaron* (of *Lyon, Beaulaurier & Aaron*) and *W. L. Weigand, Jr.,* for respondents.

*J. S. Applegate* and *Thomas B. Grahn* (of *Halverson, Applegate & McDonald*) and *Helsell, Paul, Fetterman, Todd & Hokanson,* by *Harold D. Johnson,* amici curiae.

HAMILTON, J.—The trial court declared pertinent portions of RCW 15.38 (Filled Dairy Products Act) unconstitutional, and enjoined the Director of Agriculture from enforcing the act against Mr. and Mrs. Kenneth Reesman, doing business as Reesman's Dairy. The state of Washington and the Director of Agriculture have appealed. We reverse the judgment.

The respondents, Mr. and Mrs. Reesman, own and operate a dairy plant in Toppenish, Washington. Their products are distributed generally in the Yakima area, and retailed in part through their own drive-in outlets. In the course of their operation they acquired a franchise to manufacture and distribute a product known as "Farmer's Daughter." This is a high protein drink, consisting of powdered milk from which the butter fat has been removed and to which has been added, water, vegetable oil, sodium caseinate, corn syrup solids, starch, monodiglyceride, carotene, and units of vitamins A and D. The product, when compounded, is the color of milk, has the general viscosity of milk, and to some tastes and smells like milk. It is to be distributed in a paper carton identical in shape and design to a standard half-gal-

lon paper milk carton. A dairy and a dairymaid are pictured on the carton, around and about which is written in varying size print, "farmer's daughter," "Hi-Protein Drink," "Pasteurized Homogenized," "Delicious Nutritious," "Contains No Animal Fat," and "modern science has now achieved a unique, healthful liquid—as nutritious and tasty as the natural product. It is made possible by a secret formula recently discovered by one of America's leading dairy scientists." The ingredients are listed and Reesman's Dairy is named as the processor and distributor.

Because of the composition and milk-like qualities of the product it comes within the scope of the Filled Dairy Products Act, RCW 15.38, which provides in pertinent part:

Whenever used in this chapter:

. . . .

(2) The term "filled dairy products" means any milk, cream, or skimmed milk, or any combination thereof, whether or not condensed, evaporated, concentrated, frozen, powdered, dried, or desicated, or any food product made or manufactured therefrom, to which has been added, or which has been blended or compounded with, any fat or oil other than milk fat *so that the resulting product is in imitation or semblance of any dairy product, including but not limited to, milk, . . . skimmed milk, . . . or skim-milk, . . . .* (Italics ours.) RCW 15.38.010.

(1) It shall be unlawful in intrastate commerce for any person to manufacture, sell, exchange, purvey, transport or possess any filled dairy product or to offer or expose for sale or exchange or to be purveyed any such product; . . . . RCW 15.38.020.

The provisions of this chapter may be enforced by injunction brought by any private person, firm, or corporation or by a municipal corporation or agent or subdivision thereof, in any court having jurisdiction to grant injunctive relief.

. . . .

In addition, all filled dairy products as defined herein and all food products containing filled dairy products as an ingredient are hereby declared to be adulterated for all purposes of law including all the purposes of the Washington uniform food, drug and cosmetic act, RCW 69.04.001 to 69.04.870, inclusive. RCW 15.38.040.

Upon discovering the applicability of the foregoing statutes to their proposed product, respondents commenced this action challenging the constitutionality of RCW 15.38 as a whole, and particularly that portion of the legislation declaring a filled dairy product to be adulterated. They predicated their challenge upon the ground that the legislation transcended the state's police power in violation of article 1, section 3, of the state constitution and the due process and equal protection clause of the fourteenth amendment to the United States Constitution in that the statute totally prohibited, rather than merely regulated, the marketing of a wholesome and nutritious food product. Thereafter, the state acting through the Director of Agriculture answered the respondents' claim and sought to impose an embargo on the product pursuant to the Uniform Food, Drug and Cosmetic Act, RCW 69.04. The embargo was restrained pending trial of the action, which in turn resulted in the trial court's judgment invalidating RCW 15.38.020(1) and permanently enjoining enforcement of that section against respondents.

In reaching its conclusion, the trial court in substance found as a fact that the product in question was (a) a filled dairy product within the contemplation of RCW 15.38.010(2), (b) in the semblance of milk, and (c) harmless, nutritious and wholesome. The trial court then concluded that the complete prohibition of the manufacture and sale of the product was an invalid exercise of the state's police power.

The primary issue thus presented on appeal is whether the legislature exceeded its constitutional powers in enacting a statute *prohibiting* the manufacture and distribution of a nondeleterious and nutritious dairy product on the basis of its being "filled" with nondairy ingredients, the combination of which result in a product resembling a natural dairy product.

We have many times emphasized the broad scope of the state's police power, consistently approving of the following language found in *Shea v. Olson*, 185 Wash. 143, 53 P.2d 615, 111 A.L.R. 998 (1936), at 153:

However difficult it may be to give a precise or satisfactory definition of "police power," there is no doubt that the state, in the exercise of such power, may prescribe laws tending to promote the health, peace, morals, education, good order and welfare of the people. Police power is an attribute of sovereignty, an essential element of the power to govern, and a function that cannot be surrendered. It exists without express declaration, and the only limitation upon it is that it must reasonably tend to correct some evil or promote some interest of the state, and not violate any direct or positive mandate of the constitution.

■■ A broad discretion is thus vested in the legislature to determine what the public interest demands under particular circumstances, and what measures are necessary to secure and protect the same. Unless the measures adopted by the legislature in given circumstances are palpably unreasonable and arbitrary so as to needlessly invade property or personal rights as protected by the constitution, the legislative judgment will prevail. With this in mind, we stated in *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960), at 431:

> Where the validity of a statute is assailed, there is a presumption of the constitutionality of the legislative enactment, unless its repugnancy to the constitution clearly appears or is made to appear beyond a reasonable doubt. *Port of Tacoma v. Parosa,* 52 Wn. (2d) 181, 324 P. (2d) 438; *In re Bartz,* 47 Wn. (2d) 161, 287 P. (2d) 119; *Union High School Dist. No. 1 v. Taxpayers of Union High School Dist. No. 1,* 26 Wn. (2d) 1, 172 P. (2d) 591. Where possible, it will be presumed that the legislature has affirmatively determined any special facts requisite to the validity of the enactment, even though no legislative finding of fact appears in the statute. *State ex rel. Collier v. Yelle,* 9 Wn. (2d) 317, 333, 115 P. (2d) 373.

And, as we stated in *Lenci v. Seattle,* 63 Wn.2d 664, 388 P.2d 926 (1964), at 668:

> These rules are more than mere rules of judicial convenience. They mark the line of demarcation between legislative and judicial functions.

Against this backdrop then, we turn to the legislation in question to ascertain whether its repugnancy to the consti-

tution clearly appears or is made to appear beyond a reasonable doubt.

The declared legislative purpose motivating the enactment of the Washington Filled Dairy Products Act is stated in RCW 15.38.001 as follows:

Filled dairy products resemble genuine dairy products so closely that they lend themselves readily to substitution for and confusion with such dairy products and in many cases cannot be distinguished from genuine dairy products by the ordinary consumer. The manufacture, sale, exchange, purveying, transportation, possession, or offering for sale or exchange or purveyance of filled dairy products creates a condition conducive to substitution, confusion, deception, and fraud, and one which if permitted to exist tends to interfere with the orderly and fair marketing of foods essential to the well-being of the people of this state. It is hereby declared to be the purpose of this chapter to correct and eliminate the condition above referred to; to protect the public from confusion, fraud and deception; to prohibit practices inimical to the general welfare; and to promote the orderly and fair marketing of essential foods.

The legislature has thus put its finger squarely upon the evil which the enactment was designed to guard against, *i.e.*, the manufacture, distribution and sale of a substitute dairy product which, by its resemblance to the natural product, is conducive to consumer confusion and deception. This has been held to be a valid basis upon which to rest the exercise of the state's police power, for the prevention of deception and fraud upon the consuming public is in the public interest. *Carolene Prods. Co. v. United States*, 323 U.S. 18, 89 L. Ed. 15, 65 Sup. Ct. 1, 155 A.L.R. 1371 (1944); *Sage Stores Co. v. Kansas ex rel. Mitchell*, 323 U.S. 32, 89 L. Ed. 25, 65 Sup. Ct. 9 (1944); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 10 L. Ed. 2d 248, 83 Sup. Ct. 1210 (1963); *Poole & Creber Market Co. v. Breshears*, 343 Mo. 1133, 125 S.W.2d 23 (1939); *Hathaway v. McDonald*, 27 Wash. 659, 68 Pac. 376 (1902). The underlying objective, therefore, of the legislation cannot be said to be unreasonable, arbitrary, and capricious, or in violation of a constitutional mandate.

Having determined that the expressed legislative purpose for the Filled Dairy Products Act is constitutionally sound, we turn to the primary axis upon which the trial court turned its conclusion that the act represented an excessive and invalid exercise of the police power, that is, the trial court's belief that the means chosen to accomplish the purpose were unnecessary, unreasonable and arbitrary and were not rationally related to the objective of the act.

By RCW 15.38.020(1) the legislature elected to *prohibit* the manufacture and marketing of any filled dairy product. The effective scope of this prohibition is limited, however, by the restrictive definition of filled dairy products found in RCW 15.38.010(2), which provides that such products must not only contain, as an ingredient, a fat or oil other than milk fat, but must, in addition, be in imitation of or semblance to a genuine dairy product.

Recognizing this limitation, respondents, nevertheless, contend that it is unreasonable and arbitrary to place an absolute prohibition on a product which is otherwise wholesome and nutritious, merely because of a variation in its ingredients and its resemblance to another product. They assert that a system of regulation over retailing practices would more rationally and reasonably relate to and effect the prevention of consumer confusion, deception, and fraud. They support this contention with citations to cases in several jurisdictions where filled dairy products statutes have been declared invalid because of their prohibitory aspects. In this regard they point to *People v. Carolene Prods. Co.*, 345 Ill. 166, 177 N.E. 698 (1931); *Carolene Prods. Co. v. Thomson*, 276 Mich. 172, 267 N.W. 608 (1936); *Carolene Prods. Co. v. Banning,* 131 Neb. 429, 268 N.W. 313 (1936); and *State v. A. J. Bayless Markets, Inc.,* 86 Ariz. 193, 342 P.2d 1088 (1959).

Each of these cases, and the arguments against legislative prohibition contained therein, is distinguishable from the instant case on the basis of the language of the respective statutes involved. On the one hand, the statutes of the jurisdictions supporting respondents' contentions undertake

to prohibit filled dairy products solely upon the basis of their nondairy ingredients, and regardless of their imitation or semblance to genuine dairy products. Thus, these statutes contain a sweeping prohibition of virtually all dealings in such products in their effort to reach the evil of consumer deception and fraud. Their scope thereby exceeds their purpose.

■ On the other hand, as we have pointed out, the pertinent statute of this state prohibits dealings in dairy products containing a fat or oil other than milk fat *only* if such products are in "imitation or semblance" of a genuine dairy product. Manufacturers and distributors of products such as Farmer's Daughter are not, therefore, absolutely prohibited from carrying on business. They can readily avoid the limited aspect of the legislation by not making and marketing their products *so as to be in imitation or semblance* of a dairy product. The scope of the statute is thereby limited to and logically related to its purpose.

The respective constitutions, federal and state, were not designed to prevent reasonable legislative regulations against inherently deceptive trade practices, and neither constitution undertakes to guarantee to manufacturers or merchants the unrestricted right to engage in such practices. Certainly, in the realm of such regulations, a measure which aims in a limited way at interdicting the evil at its source is no more onerous on distributors such as respondents than would be the burden on retailers of a regulation, as inferentially suggested by respondents, which would require the retailers or other dispensers of respondents' product to separately shelve the product or otherwise clearly advise consumers that the product was not a natural dairy product. The question of the desirability and effectiveness of one method of control over the other is fairly debatable, and gives rise to a legislative choice rather than a judicial one.

Filled dairy products acts similarly drafted to prevent "imitation and semblance," rather than to completely prohibit filled products, have been upheld in other jurisdic-

tions. The Federal Filled Milk Act, 21 U.S.C.A. §§ 61-64, being substantially identical to this state's act, was found compatible with due process in *United States v. Carolene Prods. Co.,* 304 U.S. 144, 82 L. Ed. 1234, 58 Sup. Ct. 778 (1938). The United States Supreme Court there stated, at 151:

> Here the prohibition of the statute is inoperative unless the product is "in imitation or semblance of milk, cream, or skimmed milk, whether or not condensed." Whether in such circumstances the public would be adequately protected by the prohibition of false labels and false branding imposed by the Pure Food and Drugs Act, or whether it was necessary to go farther and prohibit a substitute food product thought to be injurious to health if used as a substitute when the two are not distinguishable, was a matter for the legislative judgment and not that of courts.

Although in this case the Supreme Court noted concern over nutritional deficiencies of the filled dairy product, this was not a factor for consideration when the federal statute was again challenged in *Carolene Prods. Co. v. United States,* 323 U.S. 18, 89 L. Ed. 15, 65 Sup. Ct. 1, 155 A.L.R. 1371 (1944). The Supreme Court there upheld the act as being compatible with the Fourteenth Amendment protections, this time solely upon the ground that the semblance of the artificial to the natural product, often indistinguishable by the ordinary consumer, was conducive to deception. The court stated, at 23:

> The possibility and actuality of confusion, deception and substitution was appraised by Congress. The prevention of such practices or dangers through control of shipments in interstate commerce is within the power of Congress. *United States v. Carolene Products Co.,* 304 U. S. [144] at p. 148 [82 L. Ed. 1234, 58 Sup. Ct. 778 (1938)]; cf. *McCray v. United States,* 195 U. S. 27, 63 [49 L. Ed. 78, 24 Sup. Ct. 769 (1903)]. The manner by which Congress carries out this power, subject to constitutional objections which are considered hereinafter in part "Third" of this opinion, is within legislative discretion, even though the method chosen is prohibition of manufacture, sale or shipment. Congress evidently determined that exclusion from commerce of filled milk compounds in the sem-

blance of milk was an appropriate method to strike at evils which it desired to suppress. Although it now is made to appear that one evil, the nutritional deficiencies, has been overcome, the evil of confusion remains and Congress has left the statute in effect. It seems to us clear, therefore, that there is no justification for judicial interference to withdraw these assumedly nondeleterious compounds from the prohibitions of the act. (Footnotes omitted.)

State court decisions upholding filled milk legislation of similar import include the following: *Setzer v. Mayo,* 150 Fla. 734, 9 So.2d 280 (1942); *Carolene Prods. Co. v. Mohler,* 152 Kan. 2, 102 P.2d 1044 (1940); *State ex rel. Mitchell v. Sage Stores Co.,* 157 Kan. 404, 141 P.2d 655 (1943), *aff'd* 323 U.S. 32, 89 L. Ed. 25, 65 Sup. Ct. 9 (1944); *Carolene Prods. Co. v. Hanrahan,* 291 Ky. 417, 164 S.W.2d 597 (1941); *Carolene Prods. Co. v. Harter,* 329 Pa. 49, 197 Atl. 627, 119 A.L.R. 235 (1938).

We are satisfied that the rationale and reasoning of these cases amply support our view that the limited prohibition contained in our Filled Dairy Products Act constitutes a valid exercise of the state's police power which is reasonably and rationally related to the evil of consumer confusion, deception and fraud toward which the act is aimed. We conclude that the trial court erred in holding otherwise.

The Filled Daily Products Act, in addition to constitutionally prohibiting the manufacture and sale of the proscribed products, declares such to be "adulterated" for the purposes of the Uniform Food, Drug and Cosmetic Act, thereby rendering the products subject to the embargo here sought to be imposed by the Director of Agriculture. Respondents contend that such a statutory declaration erects a conclusive presumption, which they assert is beyond the power of the legislature, citing *Adams v. Hinkle,* 51 Wn.2d 763, 322 P.2d 844 (1958).

In this respect, the trial court found as a fact that respondents' product was not an adulterated product as defined by RCW 69.04.210 which relates to products containing deleterious or poisonous substances which may be inju-

rious to health. We have no quarrel with this finding, inasmuch as there is no contention made by the state that respondents' product is harmful or deleterious.

The trial court, however, did not find or conclude that the product was beyond the scope of RCW 69.04.220, which provides:

A food shall be deemed to be adulterated (1) if any valuable constituent has been in whole or in part omitted or abstracted therefrom; or (2) if any substance has been substituted wholly or in part therefor; or (3) if damage or inferiority has been concealed in any manner; or (4) if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is.

The principal purpose of this statutory concept of adulteration is to maintain the economic integrity of food products. A product is said to be "economically adulterated" if its substituted ingredients, although not deleterious, are less expensive and the product inferior to the product which the consumer, but for confusion or deception, expected to receive. *Federal Security Adm'r v. Quaker Oats Co.,* 318 U.S. 218, 87 L. Ed. 724, 63 Sup. Ct. 589, 158 A.L.R. 832 (1943).

In our view, this concept of adulteration is consistent with the statutory prohibition of filled dairy products which are in imitation or semblance of genuine dairy products, and has a rational relationship and purpose in connection with the Filled Dairy Products Act, if for no other reason than to provide an additional method of enforcing that act.

We cannot agree with respondents that the legislature created a conclusive presumption of fact, and thereby invaded the province of the judiciary, when it declared filled dairy products to be "economically adulterated." Again, it must be borne in mind that a filled dairy product does not come within the scope of the provisions of the Filled Dairy Products Act unless and until it is appropriately determined as a fact that it is in imitation or sem-

blance of a dairy product. Respondents are in nowise precluded, by the legislative declaration of adulteration, from manufacturing and distributing a filled dairy product which is not in imitation or semblance of a genuine dairy product, or from establishing before a judicial tribunal that a given product is not in fact in imitation or semblance of such a dairy product. They can thus readily rebut and overcome the statutory declaration of adulteration.

In the instant case, the trial court found as a fact, and upon substantial evidence, that respondents' filled dairy product was in semblance of milk. This brings the product squarely within the scope of the Filled Dairy Products Act, and subjects it to the prohibition therein contained, which we have held to be a constitutional exercise of the state's police power, and, in addition, characterizes it as an economically adulterated food product subject to embargo.

The trial court's judgment enjoining the state from enforcing the provisions of RCW 15.38 is accordingly reversed.

FINLEY, C. J., WEAVER, ROSELLINI, HUNTER, HALE, NEILL, and McGOVERN, JJ., concur.

HILL, J. (concurring specially)—I would agree that the trial court should have enjoined the respondents from marketing their product in the cartons referred to in the majority opinion, because they might tend to mislead and deceive a consumer into believing that he was purchasing milk.

However, I see no necessity to haul out all the heavy constitutional artillery to hit and demolish a misleading and deceptive carton. This is apparently an effort by the State Department of Agriculture to refight the margarine battle on a different front. Today the consumer who wants butter buys butter; and the consumer who desires margarine buys margarine. The fact that there is a "semblance" between margarine and butter is quite immaterial since it

deceives no one. The evil is "deception," not "semblance"; and the remedy is proper labeling,[1] not prohibition.

It should require no constitutional argument to establish the right of the respondents to produce and sell a product that is harmless, nutritious and wholesome. That the product in question has the "color of milk, has the general viscosity of milk, and to some tastes and smells like milk" has no bearing on the right to produce it and sell it, unless the consumer is deceived thereby.

However, where, as in the present case, there is a "semblance" to milk, and the product is sold by "Reesman's Dairy" and is designated as "Farmer's Daughter," the "semblance" can well become deceptive. The state, to make sure that the consumer knows he is not getting milk, might well require the statement "Not to be sold as milk" on the front and back of the carton, and enjoin the sale unless so marked.

My concurrence is on very narrow grounds, and my disagreement with the majority certainly extends to any acceptance of the idea that the legislature has the same power as Humpty Dumpty—in Alice in Wonderland—to make any word mean "just what *I* choose it to mean—neither more nor less." (I refer to the contention that the product here in question was "adulterated.")

---

[1] A recognized trade name of "Carolene" seems to have solved the deception problem in several states including Illinois, Michigan, Missouri and Nebraska. See *State ex rel. McKittrick v. Carolene Prods. Co.*, 346 Mo. 1049, 144 S.W.2d 153 (1940); *Carolene Prods. Co. v. McLaughlin*, 365 Ill. 62, 5 N.E.2d 447 (1936); *Carolene Prods. Co. v. Thomson*, 276 Mich. 172, 267 N.W. 608 (1936); *Carolene Prods. Co. v. Banning*, 131 Neb. 429, 268 N.W. 313 (1936).

These cases all dealt with the same product which was packaged in tins and labeled "NOT TO BE SOLD FOR EVAPORATED MILK." In each case the "filled milk" act was held to deny due process of law because it prohibited the sale of any milk to which any fat or oil other than milk fat had been added, regardless of the wholesomeness or nutritional value of the product.

None of these acts, however, contained the wording "in imitation or semblance of any dairy product," as does the Washington Filled Dairy Products Act. See also, *Constitutionality of Regulations as to Milk*, Annot., 155 A.L.R. 1383, 1406-12 (1945).